GRANDVIEW BANK AND TRUST
CO., Petitioner,

v.

BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent,

Commerce Bancshares, Inc.,
Intervenor-Respondent.

No. 76–1236.

United States Court of Appeals,
Eighth Circuit.

Submitted November 11, 1976.

Decided March 2, 1977.

Rodger J. Walsh, and Robert C. Barry, Kansas City, Mo., for petitioner.

Ronald R. Glancz, Atty., Appellate Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for respondent; John D. Hawke, Jr., Gen. Counsel, J. Virgil Mattingly, Atty., Bd. of Governors of Federal Reserve System, and Rex E. Lee, Asst. Atty. Gen., Washington, D. C., on brief.

Lawrence F. Noble, Metzger, Noble, Schwarz & Kempler, Washington, D. C., for intervenor-respondent; Lawrence F. Noble, Michael A. Greenspan and John V. Austin, Washington, D. C., William H. Sanders, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., on brief.

Before LAY, BRIGHT and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

Petitioner, Grandview Bank and Trust Company (Grandview), seeks review of the Federal Reserve Board's approval of an acquisition of a new national bank (New Bank) in Grandview, Missouri, by Commerce Bancshares, Inc. (Bancshares). We sustain the Board's approval.

## I

Bancshares was organized and incorporated under Missouri law in 1966. It became a bank holding company (BHC) in 1968 and acquired the majority of the stock of Commerce Trust Company, now Commerce Bank of Kansas City, N. A., and two subsidiaries of that bank. It now controls, in addition to other business, 31 affiliated banks in Missouri as well as Compac Services, Inc., an automated data-processing service.

On January 23, 1975, the Comptroller of the Currency granted preliminary approval to a new national bank in Grandview, Missouri. In March of 1975, Bancshares sought the Federal Reserve Board's approval for acquisition of the proposed New Bank.[1]

Notice of the application was published in the Federal Register and Grandview filed a timely protest, requesting a hearing and a stay of the processing of the application. On March 15, 1976, the Board issued an order denying petitioner's request, noting that since the Comptroller had recommended approval there was no statutory requirement that the Board hold a hearing.[2] Finding the record sufficiently complete to enable it to render a decision,[3] the Board granted the application.

Pursuant to 12 U.S.C. § 1848, petitioner, Grandview, seeks a review of the Board's order. It asserts that the Board's findings on the branch banking, monopoly and financial resources issues are not supported by substantial evidence, and that the Board denied it due process by not allowing a hearing and by deleting part of the record.

Bancshares' subsequent motion to intervene was granted. Grandview's motion for stay was denied.

Grandview's major contention is that Bancshares is not a traditionally recognized BHC. It claims that Bancshares' affiliates are doing business as a "unitary operation" and requests this court to "pierce the corporate veil" and find that the acquisition of New Bank would be *de facto* branch banking violative of Missouri's branch banking laws.[4] *Cf. Whitney Nat'l Bank v. Bank of New Orleans,* 116 U.S.App. D.C. 285, 323 F.2d 290 (1963), *rev'd on other grounds,* 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).

## II

In approving Bancshares' application the Board found that New Bank would be a separate corporation with its own reserve requirements and capital stock and a loan limit based on such capital stock; that New Bank would have its own officers and a "generally" separate and independent board of directors; that it would maintain separate books of account, issue its own distinctive checks, and use its own stationery; that money deposited at New Bank would not be credited to the account of a depositor at any other of Bancshares' subsidiaries nor would money deposited at another subsidiary be credited to the account of a depositor at New Bank. The Board concluded that Bancshares is a "traditionally recognized bank holding company" and that "upon consummation of the proposed acquisition, a unitary operation will not exist between

---

1. Under 12 U.S.C. § 1842(a)(3) a bank holding company (BHC) must obtain approval of the Federal Reserve Board to acquire direct or indirect ownership or control of any voting shares of a bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank.

2. *See* 12 U.S.C. § 1842(b).

3. The Missouri director of finance had approved the application pursuant to Mo.Rev. Stat. § 362.920, and the Reserve Bank of Kansas City and the Comptroller of the Currency

had submitted their memoranda recommending approval of Bancshares' application.

4. Mo.Rev.Stat. § 362.105, subd. 1(1) provides, in pertinent part, that "no bank or trust company shall maintain in this state a branch bank or trust company, or receive deposits or pay checks except in its own banking house or as provided in section 362.107 [which allows one automobile banking facility]." Since national banks are prohibited from branching if a state bank in an identical situation would be so prohibited by state law, 12 U.S.C. § 36, a national banking association in Missouri may not establish branches.

Bank and any of Applicant's other banking subsidiaries."

We first review the factors considered by the Board on the branching issue.

### Management.

■ Each of the five interim directors of New Bank is a director or officer of at least one other of Bancshares' affiliate banks, and four are officers or directors of Bancshares.

Although Bancshares conceded that these interim directors would be elected at the organizational meeting of the incorporators, it stated that upon approval of the application and subsequent granting of the charter by the Comptroller, the shareholders would elect a permanent board. Bancshares stated it "would intend that the boards of directors of [New] Bank and of Commerce Bank of Kansas City, N. A. as well as the boards of Applicant's other banks would be 'substantially separate and independent.'" Bancshares also conceded that it will fill staff openings at New Bank with people who have been trained within its system.

Grandview urges that these facts demonstrate that New Bank will not have independent management, but in fact will be controlled by Bancshares. We disagree. As the Ninth Circuit observed:

> [I]t is not enough for appellants to show that common control, through stock ownership by First Bank Stock, which participates actively in the management of its subsidiaries, produces cooperation or even eliminates competition between the subsidiaries. This is a usual, although not necessary, result of common ownership and control.

*First Nat'l Bank v. First Bank Stock Corp.*, 306 F.2d 937, 942 (9th Cir. 1962).

### Capital, Surplus and Undivided Profit.

New Bank's shares will be purchased by Bancshares through use of Bancshares' own capital resources. Petitioner argues that New Bank's capital will thus be supplied by Bancshares, but we find that this is the traditional means by which a BHC acquires control of a bank.

### Loan Limits.

■ New Bank's loan limit will be based on its own capital. However, Grandview asserts that there is a possibility of increased loan capacity through affiliated banks. Bancshares concedes that New Bank will have the use of integrated participations and liaison arrangements within the holding company system. According to Bancshares this participation arrangement within the system does not consist of an automatic participation by one affiliate bank in any and all loans which may be made by another affiliate bank and which are over that bank's lending limit. Rather, each participating loan within the system must meet stringently applied criteria and the high standards imposed by Bancshares as well as being acceptable to the participating bank. We find these transactions to be the traditional and legal means by which a BHC may work with its affiliates.

### Public Identity and "De Facto" Operation.

The Board's only finding on the identity issue was that New Bank will "issue its own distinctive checks, and use its own stationery."

Bancshares urges:

> A person maintaining an account in Commerce Bank of Kansas City, N.A. or with any other bank affiliated with Applicant but not having an account with Bank would not be able to effect a deposit to or a withdrawal from such account at any office of Bank nor would the reverse situation occur. It would, of course, be possible for an ultimate withdrawal to be made by means of cashing a check at an affiliated bank other than the one where the customer would maintain his account but any check cashing privileges would be subject to the same procedures applicable in any such situation. Additionally, it is, of course, possible for an individual to present cash or its equivalent at a bank and cause the same to be wire transferred to another bank for the individual's account. While Commerce

Bank of Kansas City has handled transactions of this nature a fee is charged for such wire transfers and no deposit receipt is issued to a customer by the transferring bank.

Nevertheless, petitioner is correct in its assertion that Bancshares' advertising suggests a more unitary operation. Bancshares advertises:

If you're a Missouri attorney who deals with Trust and Estate problems, the Commerce Bancshares family of banks brings you a new concept in estate handling. Statewide trust services that use our full team of 140 trust specialists.

It's a fact that most small banks simply cannot justify the expense of providing adequately trained personnel to handle trust matters for their customers. So, these customers must seek help from some big city trust department where they are unknown.

This is not the case with the banks in the Commerce Bancshares family. No matter how small, most Commerce banks are backed by our full team of 140 trust specialists, always ready to serve you and your clients.

Take advantage of this new concept in statewide trust services. When you have a client with a trust or estate problem, call your local Commerce Bank. And put our team of 140 trust specialists to work for you.

One advertisement ends with this statement: "When you bank at Commerce you bank at an affiliate of Commerce Bancshares with assets of more than $1.5 billion."

The banking affiliates share the cost of the advertising which is controlled by a central marketing department. Each affiliate bank makes its own decision on whether to participate in a particular advertising campaign.

■ Grandview also urges that an automated data-processing service affiliated with Bancshares will provide automated general ledger service to New Bank as it does for all of is affiliates, thus suggesting a unitary operation. However, New Bank will maintain separate books of account and this service is permissible under the Bank Holding Company Act.[5]

■ Based upon this analysis we conclude that Bancshares is an existing multibank BHC seeking to acquire a newly established bank in an area where it could not branch. The commonality of directors and officers within the Bancshares system, its management training program, and its advertising all suggest a *de facto* unitary system. The Board acknowledges that "[s]ince Applicant's subsidiaries are not precluded from establishing offices in the city of Grandview proper because of Missouri's branching laws, the subject proposal represents the only means by which Applicant can extend its operations in that city."

Although we are persuaded by Grandview's argument that New Bank will have many of the attributes of a traditional branch bank, we must hold that its attack is made in the wrong forum. Although many of the operations of Bancshares appear to be "unitary," they are not in violation of the Bank Holding Company Act. *See* 12 U.S.C. § 1841 *et seq.*

Congress was well aware at the time of passage of the Bank Holding Company Act that many of the operations of a BHC would simulate branch banking.[6] In passing this legislation, Congress made it possible for each state to exercise a veto over

---

**5.** 12 U.S.C. § 1843(c)(1)(C), exempts from the divestment requirements of 12 U.S.C. § 1843(a), shares of a company engaged solely in the business of its furnishing services to or performing services for a BHC or its subsidiary banks. Section 225.104 of the Code of Federal Regulations permits Bancshares interest in Compac Services, Inc., because Compac is a separate corporation in which Bancshares owns stock. Furthermore, 12 CFR § 225.-4(a)(8)(i) specifically allows a BHC to provide

"bookkeeping or data processing services for the internal operations of the holding company and its subsidiaries. · . . . "

**6.** *See generally Hearings on S. 880, S. 2350 and H.R. 6227 Before a Subcomm. of the Senate Comm. on Banking and Currency,* 84th Cong., 1st Sess. (1955); and *Hearings on H.R. 2674 Before the House Comm. on Banking and Currency,* 84th Cong., 1st Sess. (1955).

BHCs in the same manner that it has passed restrictive legislation covering branch banking.[7] The State of Missouri allows BHC operations. *See* Mo.Rev.Stat. § 362.910 *et seq.*

Whether policy considerations favor adoption of BHC legislation or militate against it (by reason of the same competitive factors which restrict branch banking) is not a proper judicial concern. The argument that BHCs allow parent banks to achieve indirectly that which branch banking laws directly prohibit is not one which the courts should entertain.

As a BHC Bancshares does not conduct a direct unitary operation as where a parent sets up a branch and then operates the two offices as one bank. The facts of *Whitney, supra,* are thus distinguishable. Notwithstanding the similarity with some phases of branch banking, there is no showing that New Bank will, within the purview of 12 U.S.C. § 36(f), operate to receive deposits, pay checks or lend money on behalf of the parent bank.[8]

■ We acknowledged the validity of the rationale of *Whitney* in *Commercial Nat'l Bank v. Board of Governors,* 451 F.2d 86 (8th Cir. 1971), and stated:

> [A] banking institution cannot avoid state branch banking restrictions merely because it is organized as a holding company, if it is in fact carrying out branch banking.

451 F.2d at 89.

Where there might exist fraud or a complete subterfuge, this test may have validity. However, more realistic is the fact that the BHC Act permits many activities simi-

lar to branch banking. Petitioner shows no adequate basis for our overturning the Board's approval merely because the identity between the holding company and the bank is not completely separate.

## III

Grandview has raised other issues. It challenges the Board's finding that Bancshares' acquisition of New Bank will not result in a monopoly or have an anticompetitive effect. The Board found:

> Since Bank is a proposed new bank, consummation of the proposal would not eliminate any existing competition, nor does it appear that the proposal would have any adverse effects on potential competition.

■ The Federal Reserve Bank of Kansas City investigated and analyzed the application and concluded that "the entire area encompassed by its six-county market definition constitutes the relevant banking market." The Reserve Bank concluded that "Jackson County is in no way isolated or separate from the rest of . . . urbanized Kansas City . . . ." This report was part of the record before the Board.[9] There is also evidence that the Board considered and rejected Grandview's contention that Jackson County was the relevant market area. Its continued urging in this matter is no more than a disagreement with the Board's conclusion. In determining the relevant market area we must give great weight to the expertise of the Board which is familiar with the competitive structure of the area involved. The evidence clearly supports the Board's findings here. *Cf.*

---

7. 12 U.S.C. § 1846 provides:

> The enactment by the Congress of this chapter shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to banks, bank holding companies, and subsidiaries thereof.

8. New Bank is a separate corporation subject to laws governing all independent banks and holding company subsidiaries. As has been pointed up, "[t]hese controls include provisions for receivership, separate liability for negligence of directors, separate loan limits, a provi-

sion making illegal investment in one subsidiary's obligations by the other or acceptance of the other's securities as collateral, and one prohibiting direct loans between subsidiaries." Comment, *Branch Banking Limitations Held Applicable to Approved Bank Holding Company Operation,* 39 N.Y.U.L.Rev. 686, 694 (1964).

9. 12 CFR §§ 225.3(a) and 262.3 require that an application for approval by the Board be filed with the Federal Reserve Bank and that the Reserve Bank make such investigation as may be necessary.

*North Hills Bank v. Board of Governors,* 506 F.2d 623 (8th Cir. 1974).

The Board's conclusion that the acquisition would be procompetitive is entitled to the same deference and is also supported by the record. The Board found that "[s]ince Bank is a proposed new bank, its acquisition by Applicant would not increase the concentration of banking resources in Missouri nor change Applicant's rank among banking organizations in the State." This court has determined that:

> Appellate review of a decision of the Board which is rationally based upon a full and complete record is severely limited. The Board's particular competence to determine whether a bank holding company acquisition will have substantial anticompetitive effects has been recognized by the Congress and accepted by the courts.

*North Hills Bank v. Board of Governors, supra,* 506 F.2d at 625.

*Other Statutory Considerations.*

■ Pursuant to 12 U.S.C. § 1842(c) the Board must consider "financial and managerial resources and future prospects of the company or companies and bank concerned" in determining whether to approve a BHC acquisition. Grandview contends that there was substantial evidence that Bancshares did not have financial and managerial resources necessary for approval of the application.

The record indicates that both the Reserve Bank and the Board examined Bancshares' financial position in great detail. Reserve Bank found its capital condition had remained approximately the same over a number of years; none of its subsidiary banks was capital deficient; operations of these banks were satisfactory; and New Bank should become a viable bank.

The Board determined that the financial resources and future prospects of Bancshares and New Bank were "satisfactory and

10. *See* n. 1, *supra.*

11. On June 3, 1976, this court denied Grandview's motions to make certain pages part of

consistent with approval of· the application." These findings are reasonable and must be sustained.

*Comptroller's Withdrawn Approval.*

■ Grandview further contends that the Comptroller's preliminary approval for the organizational charter of New Bank, granted January 23, 1975, was conditioned on the bank opening for business within one year or the preliminary approval would be withdrawn.[10] Since the Board did not approve the application until March 15, 1976, Grandview argues that the Board acted without authority and its order should be reversed.

This argument is without merit. The Board's order approving Bancshares' acquisition of New Bank was not dependent on prior charter approval of New Bank. In any event Grandview acknowledges that the Comptroller, through a subordinate, extended the required opening date.

*Hearing Issue.*

Grandview claims it was denied due process because there were deletions in the record, and it was not allowed discovery by depositions or a hearing.

We have previously rejected Grandview's deletion argument as non-meritorious.[11]

■ When a BHC applies to acquire a newly chartered national bank a hearing is required only if the Comptroller expresses written disapproval. 12 U.S.C. § 1842(b). In this case the Comptroller recommended approval, so the Board was not constitutionally required to hold trial-type hearings. *See Commercial Nat'l Bank v. Board of Governors, supra,* 451 F.2d at 90. In any event Grandview was allowed to submit a significant amount of information for the Board's consideration.

On the hearing issue this court has said:

> In connection with the request for hearing, it should also be noted that fol-

the record or available to Grandview for review.

lowing the filing of the original application petitioner was given every opportunity to submit to the Board whatever facts, data, theory or argument it desired. Petitioner failed in this proceeding to direct attention to any facts not presented to the Board or overlooked by it. Apparently petitioner presented everything it had. We conclude that the Board gave full consideration thereto. Under such circumstances, the holding of a hearing would have been an unnecessary proceeding and would obviously have availed nothing.

*Northwest Bancorporation v. Board of Governors*, 303 F.2d 832, 844 (8th Cir. 1962).

Grandview also argues that there was a conflict of interest in that the Chairman of the Board of Bancshares was a director of the Kansas City Reserve Bank at the time deletions from the record were made. However, regulations would have removed the Reserve Bank's authority to approve this application and it acted only as an investigator not a decision-maker here. *See* 12 CFR § 265.2(a)(3)(i)(a).

Since we affirm the Board's order we need not discuss the 91-day rule issue raised by Bancshares.

The order of the Federal Reserve Board is affirmed.