Thomas H. HUSTON, as Superintendent of Banking, State of Iowa, Petitioner,

v.

BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.

Intervenor (KSAD, Inc.) for Respondents.

Thomas H. HUSTON, as Superintendent of Banking, State of Iowa, Petitioner,

v.

BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.

Intervenors (Banks of Iowa, Inc.; First Bank System, Inc.) for Respondents.

Nos. 84–1084, 84–1361.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1984.

Decided March 26, 1985.

Howard Hagen, Des Moines, Iowa, for petitioner.

Richard M. Ashton, Washington, D.C., for respondent.

Before HEANEY, Circuit Judge, ROSS, Circuit Judge, and HENLEY, Senior Circuit Judge.

HENLEY, Senior Circuit Judge.

These direct appeals from two decisions of the Board of Governors of the Federal Reserve System (the Board) are brought under the Bank Holding Company Act, 12 U.S.C. §§ 1841–50 (the Act), by the Superintendent of Banking for the State of Iowa. Although the appeals involve separate factual situations, they have been consolidated for purposes of today's decision, because they involve similar issues as to the extent of the Board's responsibilities under § 3(d) of the Act (the so-called "Douglas Amendment," 12 U.S.C. § 1842(d)) for regulating interstate expansion of bank holding companies.

Both Board decisions concern acquisitions of interests in Iowa bank holding companies by out-of-state bank holding companies—acquisitions the Superintendent has challenged as violative of Iowa banking law and of the Douglas Amendment. The primary purpose of the Board's first decision was to approve an application filed by KSAD, Inc., a newly formed Iowa corporation, for Board permission to become a bank holding company by acquiring First National Bank of Council Bluffs (First National), an Iowa bank. As part of the approval decision, however, the Board concluded that a concurrent transaction proposed by KSAD, whereby Omaha National Corporation (Omaha National), a Nebraska bank holding company, would purchase nonvoting stock in KSAD, was not subject to Board approval under the Act. The second Board decision before us concerns an acquisition by First Bank Systems, Inc. (First Bank), a Minnesota bank holding company, of nonvoting stock in, and contractual rights with, Banks of Iowa, Inc. (BI), an Iowa bank holding company. The Board concluded that the BI/First Bank transaction, like the KSAD/Omaha National transaction, would not require Board approval under the Act.

The Superintendent now petitions under 12 U.S.C. § 1848 for judicial review of the Board's decisions, contending, in essence, that Iowa law prohibits interstate ownership of interests in Iowa banking institutions; that the Board is responsible under the Douglas Amendment for enforcing state limitations on interstate expansion of bank holding companies; and that the Board's refusal to disturb the KSAD/Omaha National and BI/First Bank transactions constituted an abdication of the Board's statutory duties. First Bank, BI, and KSAD have intervened in defense of their interstate transactions. Finding no error in the conclusion that neither transaction required Board approval under the Douglas Amendment, we affirm.

## STATUTORY BACKGROUND

Congress enacted the Bank Holding Company Act in 1956, intending, among other things, to prevent undue concentration of banking resources, and to deter anticompetitive tendencies in national credit markets. *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 46, 100 S.Ct. 2009, 2020, 64 L.Ed.2d 702 (1980). To those ends, Congress vested the Board with supervisory authority over direct and indirect acquisitions of banks by holding companies. Under § 3(a) of the Act, any company wishing to obtain control or ownership of a bank, and any bank wishing to place itself under the control or ownership of another company, must first obtain the Board's approval. 12 U.S.C. § 1842(a)(1), (a)(2). Initial approval by the Board is also required

when a bank holding company proposes to acquire "direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank." 12 U.S.C. § 1842(a)(3). Section 2(a)(2)(C) of the Act gives the Board discretion in determining whether or not a company controls a bank or other company; control will be found if *the Board determines*, after notice and opportunity for hearing," that a company directly or indirectly exercises a "controlling influence over the management or policies of [another] bank or company." 12 U.S.C. § 1841(a)(2)(C) (emphasis added). The Board is also empowered to issue such regulations as are necessary to prevent evasions of the Act. 12 U.S.C. § 1844(b).

In addition to vesting these and other powers in the Board, Congress also chose to rely in part on state law to check undue concentration of banking resources. Section 7 of the Act reserves to the states a general power to regulate bank holding companies. 12 U.S.C. § 1846; *Lewis v. BT Investment Managers, Inc.*, 447 U.S. at 48–49, 100 S.Ct. at 2022. Also, § 3(d) of the Act—the Douglas Amendment—provides:

[N]o application ... shall be approved [by the Board] which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company, whichever is later, *unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to*

*that effect and not merely by implication.*

12 U.S.C. § 1842(d) (emphasis added).

## THE BOARD'S DECISIONS

Both Board decisions under review followed a similar course. The Board concluded that even if Iowa banking law prohibited any acquisition by out-of-state companies of interests in Iowa bank holding companies, the Board was not required to disturb the KSAD/Omaha National and BI/First Bank transactions unless those transactions were subject to initial Board approval under § 3(a) of the Act. In the KSAD/Omaha National decision, the Board also concluded that Iowa law prohibited only those interstate transactions which would require approval by the Board under the Act; the Board further indicated that a contrary reading of Iowa law would render that law invalid as violative of the Commerce Clause. In support of its constitutional analysis, the Board cited *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980).

The Board then analyzed each transaction. The Board determined that because neither transaction would result in Omaha National or First Bank obtaining control of more than five percent of the voting stock of KSAD or BI, the § 3(a)(3) [12 U.S.C. § 1842(a)(3)] requirement of prior Board approval was inapplicable. The Board also determined that the transactions did not give Omaha National or First Bank a controlling influence over the Iowa bank holding companies; therefore, the Board reasoned, the transactions were not subject to Board approval under other provisions of § 3(a). The Board also concluded that it need not conduct hearings, as there were no issues of material fact presented by either record.

## ISSUES

The Superintendent contends that the Board's handling of the KSAD/Omaha National and BI/First Bank transactions contravened the spirit and letter of the Act in three ways. He first contends that the Board's interpretation of the extent of its

responsibilities under the Douglas Amendment for enforcing restrictive state laws was unduly narrow—that such responsibilities exist without regard to whether a given transaction would otherwise be subject to mandatory regulation by the Board. Second, the Superintendent contends that the acquisitions of interests in KSAD and BI were subject to prior Board approval under § 3(a) of the Act, and that the Board's decisions to the contrary were erroneous. Third, the Superintendent believes the Board was required, under § 2(a)(2)(C) of the Act [12 U.S.C. § 1841(a)(2)(C)], to hold formal hearings to determine whether the interstate acquisitions would be consistent with the Act. In connection with this last point, the Superintendent also alleges that the procedures used by the Board to review the KSAD/Omaha National and BI/First Bank transactions were defective under the Administrative Procedure Act. We will address each of these contentions in turn.

## EXTENT OF THE BOARD'S RESPONSIBILITIES UNDER THE DOUGLAS AMENDMENT FOR INTERPRETING AND ENFORCING STATE LAW

The Superintendent's first argument concerns the proper interpretation of the Douglas Amendment, and of Iowa Code § 524.1805 (1983). The Douglas Amendment, the Superintendent states, obligates the Board to insure that bank holding companies comply with all state restrictions of their ability to expand over state lines. In support of this interpretation of the Douglas Amendment, the Superintendent notes that the Douglas Amendment by its own terms applies to acquisitions of any "interest in" out-of-state banks. 12 U.S.C. § 1842(d). The Superintendent contends his reading of the Douglas Amendment is also buttressed by legislative history; prior Board decisions under Douglas; statutory provisions requiring the Board to prevent evasions of the Act, and recognizing the power of the states to regulate banking, 12

U.S.C. §§ 1844(b), 1846; *Iowa Independent Bankers v. Board of Governors,* 511 F.2d 1288 (D.C.Cir.), *cert. denied,* 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975); and the "national preference for local decentralized banking" which he alleges is "codified in ... federal law." Furthermore, both the Superintendent, and the Iowa Attorney General's office, have represented that Iowa Code § 524.1805 prohibits any expansion into Iowa by out-of-state bank holding companies.[1]

In 1964, this court held that

The words of [the Douglas Amendment] reading: "no application shall be approved under this section" manifest a Congressional intention that the section only applies where approval of the Board of Governors is required. ... [S]uch interpretation is substantiated by the legislative history and the administrative interpretation of such provision by the Board of Governors.

*South Dakota v. National Bank of South Dakota,* 335 F.2d 444, 449 (8th Cir.1964), *cert. denied,* 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965). *Accord Marshall & Ilsley Corp. v. Heimann,* 652 F.2d 685, 699 (7th Cir.1981); *Leuthold v. Camp,* 273 F.Supp. 695, 702 (D.Mont.1967), *aff'd,* 405 F.2d 499 (9th Cir.1969).

■ We see no reason to depart from our earlier holding. Section 3(a) of the Act [12 U.S.C. § 1842(a)] carefully describes which transactions Congress wished to subject to prior Board approval; we have found no basis for assuming Congress also intended to subject additional or less significant transactions to mandatory review by the Board. In particular, we think the Douglas Amendment's reference to acquisition of any "interest in" a bank merely recognizes the fact that an acquisition insignificant in itself may be enough in combination with earlier or concurrent acquisitions to require Board review. The *Iowa Independent Bankers* case, the Board precedents cited by the Superintendent

---

1. The parties do not cite, and we have been unable to find, any decisions of Iowa courts that

address the reach of Iowa Code § 524.1805.

(*Bank of New England Corp.*, 70 Fed.Res. Bull. 374 (1984); *Bank of New York Company, Inc.*, Board Order of May 15, 1984)), and § 7 of the Act, 12 U.S.C. § 1846, all concern the extent of the states' authority to regulate interstate acquisitions, rather than the extent of the Board's responsibilities under the Act for seeing that such state regulations are obeyed.

In short, we conclude that the Board was responsible under the Douglas Amendment for preventing, or for inquiring further into, possible violations of Iowa Code § 524.1805 by KSAD, Omaha National, BI, and First Bank only if the interstate transactions were subject to mandatory review by the Board under § 3(a) of the Act.[2] To that question we now turn.

## NECESSITY FOR FORMAL BOARD APPROVAL OF THE KSAD/OMAHA NATIONAL AND BI/FIRST BANK TRANSACTIONS UNDER § 3 OF THE ACT

█ The Superintendent makes three arguments in support of his assertion that the KSAD/Omaha National and BI/First Bank transactions required approval by the Board under § 3 of the Act. First, he argues that Omaha National's ownership of nonvoting stock in KSAD, and First Bank's ownership of nonvoting stock in, and contractual rights with, BI, subjected the transactions to initial approval by the Board under § 3(a)(3) of the Act, 12 U.S.C. § 1842(a)(3), regardless of whether or not Omaha National or First Bank had thereby acquired control of any of the Iowa banking institutions. Next, he contends that the Board erred in finding that neither transaction resulted in Omaha National or First Bank acquiring a "controlling influence" over KSAD or BI. Finally, he argues that because the KSAD/Omaha National transaction was before the Board as

part of KSAD's application to become a bank holding company by acquiring First National, Omaha National's interstate acquisition was subject to Board approval under § 3(a)(1) of the Act, 12 U.S.C. § 1842(a)(1).

### 1. Applicability of § 3(a)(3)

The Act states that

It shall be unlawful except with the prior approval of the Board ... (3) for any bank holding company *to acquire direct or indirect ownership* or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank.

12 U.S.C. § 1842(a) (emphasis added). The Superintendent reads this provision to mean that "direct or indirect ownership" of interests in subsidiary banks subjects the owner to regulation by the Board without regard to whether the owner can control the subsidiaries. The Superintendent then points out that voting stock of subsidiary banks is the chief asset of both KSAD and BI. He concludes that Omaha National's and First Bank's ownership of interests in KSAD and BI is "indirect ownership" of voting shares of subsidiary Iowa banks and that formal applications for Board approval were necessary under § 3(a)(3).

We do not read § 3(a)(3) so broadly. Neither Omaha National, nor KSAD, own five percent of the voting stock of the Iowa bank holding companies, or of the Iowa bank holding companies' subsidiary banks. We cannot say Congress intended the term "voting stock" to mean "voting *and* nonvoting stock." As the court noted in *Leuthold v. Camp*, the fact that the distinctions

---

**2.** The Iowa Independent Bankers Association, which has filed an amicus curiae brief in these appeals, suggests that if either of these transactions actually violated state law, the Board was required to initiate cease and desist proceedings under § 8(b) of the Financial Institutions Supervisory Act of 1966, 12 U.S.C. § 1818(b). In relevant part, § 8(b) empowers the Board to initiate cease and desist proceedings if it has reasonable cause to believe a bank holding com-

pany is about to engage in an "unsafe or unsound practice," or is about to violate "law, rule or regulation." 12 U.S.C. § 1818(b)(1). Because the parties have not raised this issue on brief, or in arguments to the court, we express no opinion about what the Board's responsibilities under the Financial Institutions Supervisory Act might be. Today's opinion should not be read to resolve the question.

drawn by the Act may seem somewhat formal and arbitrary does not make disregard of those distinctions appropriate. 273 F.Supp. 695 (D.Mont.1967). *Accord Marshall & Ilsley Corp. v. Heimann*, 652 F.2d 685, 701 n. 27 (7th Cir.1981).[3] Moreover, while a parent company will be deemed to "indirectly own or control" the voting shares of its subsidiaries, 12 U.S.C. § 1841(g)(1), neither KSAD nor BI can be a "subsidiary" of Omaha National or First Bank within the meaning of the Act unless control relationships are present. Under the Act, the definitions of "control" and "subsidiary" dovetail precisely—a "subsidiary" is an entity which is "controlled." *See* 12 U.S.C. §§ 1841(a)(2), 1841(d). Hence, in the circumstances of this case, any § 3(a)(3) requirement for prior Board approval was not independent of control issues, and the KSAD/Omaha National and BI/First Bank transactions were subject to Board approval under that provision only if control relationships were created.

### 2. Presence or Absence of "Controlling Influences" Over KSAD and BI

■ Under § 3(a) of the Act, prior application to the Board is required whenever any action is taken which would result in a bank becoming a subsidiary of a bank holding company. 12 U.S.C. § 1842(a)(2). As noted above, a subsidiary is a bank which is controlled by another company. 12 U.S.C. § 1841(d), (a)(2). Although the Act contains three definitions of control, only one is arguably applicable here—the § 2(a)(2)(C) provision that control exists when "the Board determines, after notice and opportunity for a hearing, that the company directly or indirectly exercises a controlling influence over the management or policies of the bank or company." 12 U.S.C. § 1841(a)(2)(C).

In the present appeals, the materials of record pertinent to presence or absence of controlling influence are voluminous, and appear to include almost everything the Board considered in deciding the issue. These materials indicate that aside from nonvoting stock holdings, other ties exist between KSAD and Omaha National and between BI and First Bank. For example, the evidence shows that Omaha National was partially responsible for the success of KSAD's efforts to obtain the financing necessary to acquire First National. Also, a relative of KSAD's voting shareholders is a major shareholder and director of Omaha

**3.** On brief, the Superintendent points out that under the Iowa Business Corporations Act, all stockholders, regardless of their voting rights under articles of incorporation, may vote on any merger or consolidation. Iowa Code § 496A.70 (1983). In addition, under Iowa Code § 496A.57, every class of stock, regardless of its voting rights under the articles of incorporation, may vote as a class on any amendment to the articles of incorporation that would adversely affect the class.

The Act does not define "voting stock." The Board, pursuant to its powers under 12 U.S.C. § 1844(b) to enact such regulations as are necessary to administer the Act and to prevent evasions thereof, has promulgated the following regulation defining "voting" stock:

 (1)(1) "Voting securities" means shares of common or preferred stock ... or similar interests if the shares or interest, by statue [sic] charter, or in any manner, entitle the holder...
 (ii) to vote on or direct the conduct of the operations or other significant policies of the issuing company.
 (2) Preferred shares ... or similar interests are not "voting securities" if:

 (i) Any voting rights associated with the shares or interest are limited solely to the type customarily provided by statute with regard to matters that would significantly and adversely affect the rights or preference of the security or other interest ...
 (ii) The shares or interest represent an essentially passive investment or financing device and do not otherwise provide the holder with control over the issuing company; and
 (iii) The shares or interest do not entitle the holder ... to select or to vote for the selection of directors, trustees, or partners ... of the issuing company.
12 C.F.R. § 225.2(1) (1984). The administrative record before the Board in the BI/First Bank proceeding contained several references to the rights nonvoting shareholders have under the Iowa Business Corporations Act. Evidently, the Board does not consider those rights to be such that "nonvoting" stock in Iowa corporations should be considered to be "voting stock" for purposes of the Act. It is appropriate to defer to an agency's interpretation of its own regulation.

National; and the KSAD voting shareholders, individually, have enjoyed longstanding business relationships with a subsidiary bank owned by Omaha National. As for First Bank, that company has rights under a contingent merger agreement with BI. The agreement provides, in substance, that if interstate banking becomes legal in Iowa within the next fifteen years, First Bank will purchase BI, at a price to be determined according to a specified formula. The Superintendent argues that Omaha National's and First Bank's ties with the Iowa bank holding companies amount to "controlling influences." Although the Board found that no controlling influences existed, the Superintendent contends that the Board's findings lacked substantial evidentiary support and were inconsistent with prior Board precedents. He requests judicial review of the Board's findings under 12 U.S.C. § 1848.

The Superintendent disagrees with the conclusions the Board has drawn from the evidence, and asks that we accept his conclusions instead. We are unable to do so. *North Hills Bank v. Board of Governors*, 506 F.2d 623, 625 (8th Cir.1974). Essentially, the Superintendent's position is that given the relationships between KSAD and Omaha National, and between BI and First Bank, third parties will be unwilling to buy, and shareholders will be unwilling or unable to sell, the voting shares of KSAD or BI. But the degree to which voting shares of bank holding companies are marketable would seem to be a matter upon which the Board has considerable expertise; therefore, we would have great hesitation in substituting our judgment for that of the Board. *Cf. Whitney National Bank v. Bank of New Orleans*, 379 U.S. 411, 421, 85 S.Ct. 551, 558, 13 L.Ed.2d 386 (1965); *Grandview Bank & Trust Co. v. Board of Governors*, 550 F.2d 415, 420 (8th Cir.), *cert. denied*, 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977). The two interstate transactions are, in most respects, consistent with regulatory guidelines set forth by the Board for non-controlling equity investments. *See* 12 C.F.R. §§ 225.31(d), 225.143 (1984). The Board also relied on various

representations made by the parties, and on commitments made by Omaha National and First Bank not to attempt to influence the management or policies of the Iowa bank holding companies; it was in no way inappropriate for the Board to give weight to such considerations. *Independent Insurance Agents v. Board of Governors*, 736 F.2d 468, 474–76 (8th Cir.1984). There would be no impediment to the Board's instituting proceedings to redetermine control issues if at some future time the parties' representations proved false or if the parties abandon their commitments.

We conclude that the Board's findings that no controlling influence existed were supported by substantial evidence, and we do not say that application for prior Board approval of the KSAD/Omaha National and BI/First Bank transactions was required under § 3(a)(2) of the Act, 12 U.S.C. § 1842(a)(2).

### 3. Applicability of § 3(a)(1) Application Requirement to KSAD/Omaha National Transaction

■ Last, the Superintendent argues that because the Omaha National/KSAD transaction was before the Board as part of KSAD's application to become a bank holding company by acquiring First National, the interstate transaction was subject to Board approval under § 3(a)(1) of the Act. That section provides: "It shall be unlawful except with the prior approval of the Board (1) for any action to be taken that causes any company to become a bank holding company." 12 U.S.C. § 1842(a)(1). The Board concluded that the application made by KSAD under § 3(a)(1) of the Act for Board approval of the acquisition of First National was insufficient to bring the Douglas Amendment into play: "It is the Board's view, based on the language and legislative history of the Act, that unless [*Omaha National's* ] *investment in KSAD* would require an application under section 3 of the ... Act, the Douglas Amendment would not bar investment" (emphasis added). The Board reasoned that a contrary interpretation of the Act would "prohibit

an interstate nonvoting investment proposed in conjunction with an application pending before the Board, while permitting an identical investment in a bank or bank holding company proposed independently of a bank holding company application and perhaps consummated shortly thereafter."

We agree with the Board's reasoning. *Cf. Plaza Bank of West Port v. Board of Governors,* 575 F.2d 1248, 1251–52 (8th Cir.1978) (even though the Missouri Commissioner of Finance may have issued bank charter in violation of state law, Board's approval of application of bank to organize as a bank holding company did not amount to Board approval of unlawful conduct, since Board did not purport to approve validity of charter). In terms of the purposes of the Act, there is little reason to suppose Congress intended to subject newly-formed bank holding companies to more stringent regulation than that applicable to already existing bank holding companies; yet such would be the result of the construction urged by the Superintendent. The dangers posed by nonvoting equity investments in bank holding companies (anticompetitive influences in the national credit markets, undue concentration of banking assets) would seem to be the same, whether or not the "target" companies are newly formed. Furthermore, our construction of the operation of the Douglas Amendment in the context of the § 3(a)(1) application requirement does not, as the Superintendent alleges, contravene any Congressional intent embodied in Douglas to vest the states with broad authority to discriminate against out-of-state bank holding companies. In *Lewis v. BT Investment Managers, Inc.,* the Supreme Court held that

> [t]he language of the [Douglas Amendment] establishes a general federal prohibition on the acquisition or expansion of banking subsidiaries across state lines. The only authority granted to the States is the authority to create exceptions to this general prohibition, that is to *permit* expansion of banking across state lines where it otherwise would be federally prohibited.

447 U.S. 27, 47, 100 S.Ct. 2009, 2021, 64 L.Ed.2d 702 (1980).

We conclude that neither the KSAD/Omaha National transaction, nor the BI/First Bank transaction, was subject to Board approval under § 3(a) of the Act; and that, as a consequence, the Douglas Amendment did not require the Board to inquire further into the permissibility of the transactions under state law.[4]

---

**4.** In *Whitney National Bank v. Bank of New Orleans,* the Supreme Court held that under § 3(c) of the Act [12 U.S.C. § 1842(c) ], the Board could not approve any plan of organization proposed by a bank or holding company if the plan would be violative of state or federal law. 379 U.S. 411, 418–19 (1965). The Court acknowledged that this reading of the Act might require the Board to confront questions of state and constitutional law; however, the Court felt that the Act manifested a congressional intent that the Board's jurisdiction be paramount as to the organization of bank holding companies. Although § 3(c) was substantially amended in 1970, dicta, and cases construing the somewhat parallel public benefit provisions of § 4(c)(8) of the Act [12 U.S.C. § 1843(c)(8) ] suggest that the *Whitney* holding is still viable. *See Independent Insurance Agents v. Board of Governors,* 736 F.2d 468, 476 (8th Cir.1984); *Florida Association of Insurance Agents v. Board of Governors,* 591 F.2d 334, 338, 341–42 (5th Cir.1979); *North Hills Bank v. Board of Governors,* 506 F.2d 623, 625 (8th Cir.1974); *Gravois Bank v. Board of Governors,* 478 F.2d 546, 549, 551 n. 6 (8th Cir.1973). In addition, staff recommendations to the Board in the KSAD case indicate that the *Whitney* holding was the reason the Board reached issues of state and constitutional law in passing on KSAD's application.

The parties, however, have not based their arguments to this court on § 3(c). For that reason, we decline to decide whether or not the Board was required to reach the issues of state and constitutional law it addressed in its KSAD order. *Cf. Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978) (§ 3(c) of the Act empowers the Board to deny application on grounds of financial unsoundness, regardless of whether or not transaction Board was reviewing would exacerbate financial unsoundness); *County National Bancorporation v. Board of Governors,* 654 F.2d 1253, 1260 (8th Cir.1981) (§ 3(c) does not require Board to consider any and all effects of proposed transactions). Nor do we express any opinion about whether or not the Board's resolution of those issues was correct, or whether the Board was authorized to disregard the construction of Iowa law offered by state officials.

## PROCEDURES USED BY THE BOARD IN CONSIDERING THE OMAHA NATIONAL AND BI/FIRST BANK TRANSACTIONS

The only issues remaining in the case relate to the Superintendent's contentions that the procedures used by the Board in reviewing the interstate transactions were fatally defective.

 Although the Superintendent contends that the Board was required to grant his requests for a formal hearing on the KSAD/Omaha National transaction, we do not agree. The only possibly applicable hearing requirement is contained in § 2(a)(2)(C) of the Act; that provision merely indicates that controlling influence issues should be decided by the Board "after notice and an *opportunity* for a hearing." 12 U.S.C. § 1841(a)(2)(C) (emphasis added). At most, hearings are required under § 2(a)(2)(C) prior to issuance of approval orders only when the Board has been presented with legitimate disputes about issues of material fact. *Cf. Grandview Bank & Trust Co. v. Board of Governors,* 550 F.2d 415, 421–22 (8th Cir.), *cert. denied,* 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977); *Connecticut Bankers Association v. Board of Governors,* 627 F.2d 245, 251–52 (D.C.Cir.1980). The Superintendent alleged the following facts in support of his petitions for a hearing: (1) that individuals who owned important interests in, and/or occupied important positions in, KSAD and Omaha National were related; and (2) that there were secret agreements in existence between KSAD, Omaha National, and KSAD's lenders. However, there was no dispute about the existence of

the individual relationships on which the Superintendent's petitions for hearing relied; there was only a dispute about whether or not a "controlling influence" was created by those relationships. The latter dispute was not one of material fact. Furthermore, the Superintendent did not make a showing, beyond bare allegations, that any secret agreements existed; and all evidence of record indicates they did not.[5] While the Board may not lightly dismiss a request for an evidentiary hearing,

> a protestant does not become entitled to an evidentiary hearing merely on request, or on a bald or conclusory allegation that [a dispute of material fact] exists. *The protestant must make a minimal showing that material facts are in dispute,* thereby demonstrating that "an 'inquiry in depth' is appropriate." .... Evidentiary hearings consume time, energy, and resources of the Board and parties alike, apart from undue intrusion on and harassment of applicants. The Board is not to be burdened with a hearing requirement where a protestant has not given reason to believe a hearing would be worthwhile.

*Connecticut Bankers Association v. Board of Governors,* 627 F.2d at 251 (emphasis added, footnotes deleted). We conclude that the Board did not err in refusing to grant the Superintendent's requests for hearings.

The Superintendent, however, argues that the Board used different procedures in reviewing the BI/First Bank transaction than it did in reviewing the KSAD/Omaha

---

We do note, however, that because of comity and separation of powers considerations, the Board's decision on the state and constitutional law issues must be considered to be without prejudice to the Superintendent's ability to vindicate in state court whatever prohibitions of the KSAD/Omaha National and BI/First Bank transactions Iowa Code § 524.1805 lawfully expresses. *Cf. Plaza Bank of West Port v. Board of Governors,* 575 F.2d 1248, 1251–52 (8th Cir. 1978) (even though Board properly approved holding company's acquisition of bank, state may pursue state proceedings to invalidate improperly granted state bank charter).

**5.** The Superintendent does refer to a "draft buy-sell agreement" between Omaha National and KSAD that was submitted to the Board, and later "withdrawn" from the record. It appears the Board has had access in the past to this draft. KSAD has represented that the agreement was abandoned, and that no other written or oral agreement has existed between the two bank holding companies. The Superintendent has made no showing these representations might be untrue.

National transaction, and that such variation was error. He also contends that the Board erroneously transformed its review of the transactions into rulemaking proceedings. Finally, he alleges that the Board's analysis of the transactions represented an arbitrary and improper deviation from past Board precedent.

None of the Superintendent's contentions has merit. Assuming, for purposes of discussion, that the contentions might have some basis in law, they are simply inapplicable on the facts of this case. To the extent that the Board treated the BI/First Bank and KSAD/Omaha National transactions differently, those differences were not unreasonable—KSAD's application, on its face, was subject to Board approval under § 3(a) of the Act, while the First Bank/BI transaction was not. The Superintendent has not identified any statutory or regulatory procedural requirement the Board failed to observe. We cannot agree, either, that the Board transformed its review of the transactions into rulemaking proceedings. Regardless of what precedents and rules the Board may have considered in declining to interfere with the KSAD/Omaha National and BI/First Bank transactions, the Board in fact carefully considered the unique combination of rights Omaha National and First Bank had acquired. Moreover, the Board negotiated with First Bank for almost two years before it was satisfied that the merger agreement, as modified, was consistent with the Douglas Amendment. Finally, we see no evidence in the administrative precedents the Superintendent has cited that the Board has reversed its position on nonvoting equity investments. At best, these precedents show that such nonvoting investments are a fairly new development, and that the Board's view of the permissibility of any particular investment will depend on all of the circumstances of the case.

For the reasons given, the Board's orders are affirmed.